Good morning, your honors. I'm Ayanna Curry for the plaintiff. May it please the court. I would go ahead and start with the question that the court gave us earlier this week, which is, under California negligence law, can liability arise from the tactical conduct and decisions employed by the officers preceding a use of non-deadly force? My answer is no. I don't think this court needs to certify that question to the court. And moreover, it's already answered in Hays. Hays, the California Supreme Court said, the Court of Appeal case that it was overruling overlooked the long-established principle of California negligence law that reasonableness of a police officer's conduct must be determined in light of the totality of circumstances. I don't think so, though, because Hays also said we've never addressed whether peace officers owe a duty of care when, without any use of deadly force, suggests that they have not resolved what happened. The sentence goes on to say we haven't decided that. And then our court, in Mulligan v. Nichols, said Hays did not address whether decisions before non-deadly force can be actionable negligence. Because Hays relying on Groot, I just feel like Hays brought, it didn't stand for anything novel. It brought up basic, garden variety, California negligence law. And it says to find liability and negligence for anybody, regular citizens and police officers, we are looking at the totality of the circumstances. We are looking at everything that's before this actor. And if another reasonable person wouldn't have behaved the way the actor did, then you have a question of fact, not law. And it cited Groot, a 1970 case, and we said this a long time ago, your tactical decisions leading up to your use of force is... I'm not sure what happens to these cases. I know, in our practice, we much rather want the reasonableness, right? If we get to trial, we want battery, we want reasonableness. Like negligence, then you have to get into comparative law. The only times it seems to remain are the death cases. But that's not the only time police officers are held to a negligence standard, right? There's CHP cases... But am I right that you don't have just a straight-up negligence claim here? You have a wrongful death framing? We have a wrongful death framing, but we have conduct that substantially can cause death. It's seriously dangerous conduct that can necessarily lead to death. So we disagree with the district court's characterization of all these officers did was manipulate and control her extremities. That is not their testimony. That was certainly not what they said in their police interviews. So what we have is deadly force. And this court... Well, so I understand your argument that it actually was deadly force, but I think this Hays question only comes up if we disagree with you about that and think that it was a tragic death that resulted from what would have been expected to be non-deadly force. Right. So, okay, I looked up what it is that would cause you guys to certify a question. It's if there's no controlling precedent, but also if it's outcome determinative in this case, which it's not. And your argument for that is that it was deadly force? codified it, if you will, and published a decision on it, even then the officers weren't entitled to qualified immunity on their use of force in that case because basically just good old common sense. If you lay somebody on the ground on their stomach and then pile on top of them, you could kill them. And so that's in the training. And it was in the Berkeley City officers training. And there's multiple questions of facts surrounding just the quantum of force. And it's not that we created it. This is embedded in what the officer's testimony is. They are internally inconsistent with one another. So you argued that in your brief, but I had trouble figuring out what the actual inconsistencies were. Could you explain that a little more? So on summary judgment, we have Dr. Spitz, his report saying that particularly... I thought you were saying that officers testified inconsistently. and limits oxygen to the brain and to the heart. And here it limited the oxygen that got to Kayla's heart and caused a heart attack. He says this can happen when you compress the shoulders, the upper torso, the upper back, but also the lower back. Officer 2 and his... But so do you understand the expert's report to say that this would have happened without Kayla's heart defect? Yes, I do. It seems like I didn't think it was so clear that that's what the expert was saying. And if it wouldn't have happened without the heart defect, then the officers didn't know about the heart defect, right? Well, this is a different case from Gregory. And Gregory, the officers for sure didn't know that that man had like the Widowmaker, like the artery blockage of 90%. Kayla is morbidly obese. But also with a heart defect. I thought that's what the autopsy said. Well, then why is it in their training from the 1990s that if you restrain someone who's obese on their stomach, first of all, avoid it. But if you do, be very, very careful. It's because that's a characteristic, and you can just look at her and see that. Officers avoid tasing pregnant women. They avoid tasing people with obviously who have a pacemaker. Because a baton strike to the thigh is not a significant use of force, but to the back of the head it is. These are, it's not, you know, I'm not trying to be flip, calling it common sense, but they are certainly trained on these human physiological aspects for a reason. And this was in their training, and this is what Dr. Spitz is saying. Compression, and so in terms of the fact questions, the officers I think are far more forthcoming about how much force it took and how long they were on top of her. And based on that. And what are the inconsistencies? Because I think we have to have a reason to think the jury could disbelieve the officers. Sure. And so to get that, we need inconsistencies, and I was hoping you could point us to what you think are the most clear inconsistencies. Officer 2 in his police interview says she was on her stomach, and it was just me and Officer Brown. I was on her hips and had her hand, right hand in handcuffs, and I could not help Officer Brown get her left arm. She was on her shoulder blades and trying to pull her left arm out. And we were like that for several minutes before Officer Smith arrived. Officer Smith confirms she was face down. That's several minutes of just compression. So what's the inconsistency? By his deposition, it was my sternum was on her hip bone, and there was without regard for any time. And the district court's finding was it blurred it together, like they immediately got handcuffs on her, and got her on her side in recovery position right away, which is not even the evidence. The inconsistencies are even when they got her in recovery mode, that that happened right away, and that's not true either. Officer, the second officers to arrive, that's Mathis and Gardner, say she was still face down. Gardner especially says she was face down for a minute before we turned her over on her side. They kept her on her stomach until she stopped moving. They put her in recovery basically after she had expired. The breathing, and it can come out with the expert testimony at trial, that breathing that they thought they detected and then went away is called agonal breathing. Those are dying breaths. It was already done by the time they got her there. By deposition, the testimony from some of the officers is that she was in recovery immediately, and that's not the truth. Or there's a question about it. Do you have any other? Do you want to reserve the rest of your time for rebuttal? Oh, yeah. I can actually do that. Thank you. Good morning, members of the panel. My name is Lynn Borgo. I'm a deputy city attorney for the city of Berkeley. I would first like to address one of the issues that the city brought up in its answering brief, and also the appellant's counsel just referred multiple times to portions of the record that post-date the summary judgment order that's at issue on this appeal. It's the entirety of Volume 2, as well as portions of Volume 1. That includes the expert report from Dr. Spitz that was just referenced, as well as the training materials. So it's improper to ask this court to consider evidence that was not before the trial judge, Judge Breyer. But I've briefed that. I just wanted to mention that some of the argument that she just made actually doubles down. So there is a Spitz declaration, though, that's in the record, right? That's correct, Your Honor. Is there any real difference between the two? Yes, Your Honor, there are significant differences. But are the things that your opposing counsel discussed only in the part that's contested? Because I thought it was mostly in the declaration. It's in there, but it's not supported. And also the city objected based on the lack of foundation for the opinions that he made, and that was the reason that the city included its reply brief, because that included the objection to the Spitz declaration. So the big point – But did Judge Breyer exclude the Spitz declaration? He did not, Your Honor. He concluded that because he found that there was no excessive force, he did not have to get to the question of the cause of death. So that's my primary point. I do want to address the court's question regarding certification, and I was pleased to hear that appellant also does not believe that there's a need to certify the question and that it was already answered in Hays. I thought for a minute that maybe they were making my argument until it continued the way that it did. But the city agrees that there's no need to certify in this case because there is controlling precedent. I do believe that – What is the controlling precedent? Well, I do believe that Hays addresses it, and it's the Adams case. Now, Adams was a case – So what do you think the rule is? The rule is that there's no duty, Your Honor. So that's the opposite of what your opposing counsel thinks. Exactly. I said I thought she was starting to make my argument, and then I realized that we were going separate. But so if you think – We diverged. If you both are confident that that's clear, but you think the rules are opposite of each other, then isn't that a situation that suggests we should certify? Well, Your Honor, if you could let – I would like to address the Adams case and see if the panel agrees with me that Adams actually answers the question. I think the city's point is that there is no question that this panel needs the California Supreme Court to answer because the standards are already set forth in law that still remains standing today, and this panel can answer this question of law. So in the Adams case, Adams involved a suicidal subject, a man named Patrick, who shot himself, later setting off a volley of shots by the officers. So while it was a case that involved officer shootings, it was not considered a shooting case. In the Hayes court, the California Supreme Court goes over and over about Adams not being a shooting case. It's a suicide case. So one of the points is that in the Adams case, there was no duty in the Hayes court. Let me find how they exactly worded it. They said that lack of duty to prevent a suicide is really different than lack of duty to avoid negligence that could cause someone's death. Your Honor, I believe that's true. I think the suicide cases are more serious. I think that there is even less duty where you're not dealing with somebody who's holding a gun crouched in their backyard, where you know that the fact that you're going to exacerbate an already dangerous situation is very clear. Here, we had a situation where it wasn't clear that there was any imminent death that could occur. This was something that Berkeley officers do. Well, there's evidence in the record that they had 51-58 Kayla several times. It's something that they do all the time. This is not a situation where they needed to call in hostage negotiators. What did they do all the time? Take people into custody pursuant to welfare institutions. Oh, yes, but you don't all the time have taking into custody as occurred here. You had a different situation. This was a different situation. I'm not saying every situation is the same, but a 51-50 situation is something that police officers handle frequently. Well, what you're saying is that they are experienced people and they've been gone through training. Yes. How does that help you with this case? Well, in this case, let's look at – I think it's important to look at what is the appellant arguing are the tactical errors that the officers made, because I don't believe there were any tactical errors made, and that's really like even if you were to decide that you wanted to apply the Hays standard, that you should look at all of the pre-force tactics and decisions that were made, there's no reason to find negligence in this case. There are a few things that are pointed to. One is – I think the most important one is that they're saying that the officer, Brown, triggered Kayla by saying that there was an outstanding warrant, that they needed to go to the station and clear up. But Kayla was already triggered. That's why the officers were there. She had already kicked out her roommate. She was in the middle of a psychotic crisis, as is admitted by the plaintiff, and it was also admitted that she had been doing drugs all day and maybe for several days. But isn't the testimony that she became much more agitated after this statement about the warrant? And Officer Brown spent five to seven minutes in an effort to try to calm her down. It's not clear that she at that point wanted to leave the conversation. That's what the testimony is, is that she decided, kept saying, I'm going to go call the FBI. I'll find out on my own. I want to call the FBI. And Officer Brown spent five to seven minutes in continuing to converse with her. This is after the initial 15 to 20 minutes of evaluating whether she needed to be 5150'd. And so I don't think that you can say, I mean, at some point Kayla needed to be handcuffed in order to be taken into custody. And the California Supreme Court said in the case of Brown v. Ransweiler that there's a whole continuum of reasonable conduct by police officers, and you can't say that there's one way that is reasonable for an officer to take somebody in or these decisions that are made. And this is an example, saying that they should have told her she was going to be taken for a three-day psychological evaluation would have been more calming to her than we're going to go down to the station and clear up a warrant. That's something that's within an officer's range of experience and how they should handle it. And the Supreme Court has already said you can't micromanage those kind of decisions. What were the alternatives the police officers had under this arrest? To leave her in her apartment and not handle the situation, and who knows, we would be here on a different case if we don't know what would have happened if she hadn't been taken in on a 5150. Assuming the police officers were going to take her in and have the psychological testing done, etc., etc., were there alternatives in the methods they used that they should have considered? They're trained to call the fire department for a medical evaluation when somebody is exhibiting the kind of symptoms that Kayla was submitting. No, I'm not getting to that point. It seems to me the argument was that the officers, by the way they were compressing her body, exacerbated the problem that caused her death. So what alternatives were there to how they were restraining her? Thank you, Your Honor. So once the restraint occurred, that's a post-force situation, and that's an excessive force situation where the standards are in fact the same under federal and state law. So what we're trying to focus on in terms of deciding whether to certify the negligence liability question to the Cal Supreme Court is what were the decisions and conduct of the officers before they ever touched her? And so it's true that appellant does point to several things related to the manner of restraint as tactical decisions that constituted negligence, but those are the same standard. So what I'm focusing on are the pre-force standards or pre-force complaints about tactical decisions, and the first was telling her that there was a warrant. The other thing that appellant brings up is that they should have asked Kayla Moore whether she was off her meds, but the reporting party, John Hayes, had already told them that she was off her meds and he was her roommate. That was the call on the 911 call, and he also spent five minutes with Officer Brown discussing the situation before she ever went upstairs. The third item was that Officer Brown did not contact the Moore family to find out what to do, but the Moore family had been repeatedly, and this is in the record, contacting the police to deal with Kayla. Both Officer Brown and Officer Two, who were the first responders, had prior contacts with the Moore family dealing with Kayla. And then the final pre-tactic, pre-force tactic that's complained of is that the officers didn't wait for the fire department to arrive. The fire department was going to – they're paramedics. They're not psychologists or psychiatrists or social workers. They conduct a medical evaluation to make sure that this particular patient should go to the psych hospital rather than a regular hospital where they may need medical treatment. So that couldn't have resulted. So none of these things would have resulted in any kind of a different situation in terms of needing to handcuff Kayla eventually to take her in. I do want to point out that in the Adams case, and Judge Friedland's concern about that being a suicide case, the actions taken by the officers in that case were much more triggering, if you will. There were dozens of officers who showed up, many with their weapons drawn. They entered the home of the suspect. They aimed their guns at a suicidal man. They released a barking police dog on a suicidal man. And they used a non-trained officer to lead the hostage negotiations. It wasn't a hostage situation, but they were trying to do negotiations. But instead of using their trained hostage negotiator, they used somebody who didn't have that training. And then when the man ultimately did shoot himself, they all fired on him. So we don't have anything like that in this case, the level of escalation of what could cause somebody to react. Officers don't know how somebody is going to react, and they had no way to foresee that Kayla would resist. Nothing that these officers did could, in their mind, knowingly give rise to a dangerous situation that would have necessitated the need for deadly force, which is the time when the California Supreme Court says you need to look at the totality of the circumstances. It makes perfect sense. The Supreme Court is saying when you shoot somebody and an officer is involved in a homicide, you can't just say, well, they pointed their gun at me or they had a knife, and so my shooting was justified. You have to look at what preceded that in order to answer the question about whether that deadly force was justified. And why is that different from force that I guess on your position would be just slightly less than deadly force? It's the lack of knowledge that what you're doing is imminently going to cause a dangerous situation. But at the moment of the force, it's past the earlier decisions. So I'm not sure why. I'm not sure I understand the logic of why it would be different that in the moment you're about to use deadly force, we now look back and see what you did before but not in just short of deadly force. Why would that be? The force in this case, so there was resistance that resulted in them having to use their hands and in some instances their knee or in Officer 2's case, he used his sternum, his chest to hold down her hips because she was kicking and struggling. But in this case, you're dealing with handcuffing. Officers handcuff people on a daily basis. There's no reason to think when you're handcuffing somebody that that's necessarily going to result in you needing to draw your firearm and shoot them. However, I'm not saying that that never happens. They know that sometimes such subjects resist. But there was argument by appellants that they should have known that she had a heart condition because of her obesity. But they, you know, they did not know the extent. The real truth of the matter is nobody could have known the extent of her heart condition. Kayla didn't know the extent of her heart condition. I'm not sure. There's nothing in the record that suggests that Kayla knew she had a widowmaker condition or that she knew that she had a severely enlarged heart more than double the size of an enlarged heart. The expert for the city, Dr. Vilke, said it was the largest heart he had ever come across in his practice of looking at enlarged hearts. So, unfortunately, nobody knew how close to death Kayla was when this situation occurred. And it's an unfortunate situation that she did become resistant. I think that the city has laid out in the record the facts about the use of force, about the probable cause, about why this is not a purpose-to-harm case. But if there's any other questions that Your Honors would like to ask. Thank you, Counsel. Thank you. Thank you, Your Honors. I want to clarify a couple of things about the argument I made. I started off with negligence, but I went right into reasonableness. I didn't stay on the negligence street, which I know in these use-of-force cases hinges on reasonableness. But I disagree with the applicability of the Adams case, and I think Your Honor pointed it out. And the Supreme Court in Hays, the California Supreme Court in Hays, they punted on trying to decide whether there's a duty to act reasonably when trying to assist someone who's threatening to commit suicide. And they said that is not this case, and that's not what we're deciding. We are deciding reasonableness of force and basically restating what we said in Groot, that it's a totality of the circumstances basis, just like any other negligence case. So Hays, to me, has no applicability here and is really not helpful at all. And then we go into, well, I'll address the, I think this court has de novo review. The court did two motions for two orders on summary judgment, and we provided one in document number 71, which is the focus of our brief, but then also later on, on the ADA claim. But the second one was only about the ADA. But he went back. He uses the same statement of facts in both. I didn't see anything in the second order that suggested he was reconsidering any of the legal questions in the first order. Not reconsidering. It was an abundance of caution, one, to make sure that I'm giving you the record that was before the district court. But you haven't appealed the ADA claim. We have not. But we've thought about all these issues right up until the last minute. And this court is free to. And I had that in my mind also. Just because I'm not addressing it didn't mean that this court would order us to look in and know, actually, you want to talk about this issue. So that's in my mind. And there's also the matter of the policies that were withheld from plaintiff. I wanted that, one, I wanted to talk about it. And, two, I wanted to make sure that that was in front of this court. But the main point is that it was in front of the district court in his decisions. He's the one that said, okay, this is actually, they're two separate orders on summary judgment, but I'm looking at them, I'm treating them as one. And so that was the... Where did he say he was treating them as one? In his order, in his, I don't have the excerpt of the record, but in his ultimate order on document 126, he says he cites to 71 as well. And says, you know, this now disposes of the entire case. This is a final judgment case, not just a... Basically do with it parties, what you will. Just some other points on... Graham analysis reasonableness is a balance of factors. So the factors are underlying crime. That was minimal to none that she was under the influence in her own home. Her resistance, again, the testimony that we have to accept, because the officers are the only ones still alive to tell the story, is that she was bubbly, bubbly, as in effervescent, full of life, rambling and talking about nonsense and definitely delusional, to angry and then back. And as in back to okay is what I think a reasonable juror can take that to mean. And then the switch and the snap, if you will, is going hands-on. One, telling her, okay, you're under arrest, and if this really is a 5150 evaluation by the city's own policies, you never tell them that they're under arrest. You tell them this is for an evaluation and this is about the... You're straight up with them about what this is. So that's a definite question if her decision to try what her experience does, which I think it's arguable our position has caused Kayla's reaction, if that's reasonable. A jury can look at that and be like, okay, she went off script, she went off program, she went on her own, and this is the result. Of course Kayla, who didn't believe she had a warrant at all, is going to protest this, even if she wasn't ill. I think anyone would have refuted that. And... I think you're over time. I am over time. I have time to save you. Thank you for your arguments. No other questions? I don't think so. Thank you both sides for the helpful arguments. The case is submitted, and we are adjourned for the day. We are going to go conference on these cases, and then we will come back and speak with the high school students and anyone else who is interested in staying. All rise.
judges: Wallace, Friedland, Lasnik